1

2

3

4

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   REMAR SALANGO,

11            Petitioner,          No. CIV S-09-0044-TJB

12       vs.

13   D. K. SISTO,

14            Respondent.    ORDER, FINDINGS AND RECOMMENDATIONS

15   _____/

16                    I.  INTRODUCTION

17       Petitioner Remar Salango is a state prisoner proceeding pro se with a petition for writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  For the following reasons, (1) the Clerk of the

19   Court shall assign this case to a United States District Judge in accordance with the Court's

20   general assignment plan; (2) Petitioner's requests are denied; and (3) it is recommended that

21   habeas relief be denied.

22                    II.  PROCEDURAL HISTORY

23       Petitioner is currently serving a sentence of eighteen years to life following his 1991

24

25

26

conviction for second degree murder in the Kern County Superior Court.[1]  Resp't's Answer Ex.

A, at 30, ECF No. 7.[2]  Petitioner is not currently challenging his conviction; rather, the instant

petition challenges the decision by the California Board of Parole Hearings (the "Board")

denying Petitioner parole.  Petitioner appeared before the Board on January 3, 2008.

On March 19, 2008, Petitioner filed a petition for writ of habeas corpus with the Kern

County Superior Court challenging the Board's decision.  *See* Resp't's Answer Ex. A.  On May

20, 2008, the Superior Court issued a reasoned opinion denying the petition.  *See* Resp't's

Answer Ex. B.  Petitioner sought relief in the California Court of Appeal, Fifth Appellate

District, and the California Supreme Court; those petitions were likewise denied, but without

written opinions.  *See* Resp't's Answer Exs. C-F.

On January 6, 2009, Petitioner filed a federal petition for writ of habeas corpus.  *See*

Pet'r's Pet, ECF No. 1.  On August 18, 2009, Respondent filed an answer to the petition.  *See*

Resp't's Answer.  On September 3, 2009, Petitioner filed his original traverse.  *See* Pet'r's

Traverse, ECF No. 8.  On December 8, 2009, Petitioner filed an amended traverse and a motion

requesting nunc pro tunc acceptance of his traverse.  *See* Pet'r's Am. Traverse, ECF No. 9;

Pet'r's Mot. Requesting Nunc Pro Tunc Acceptance of Pet'r's Traverse, ECF No. 10.  On

January 28, 2010, the assigned United States Magistrate Judge at the time, the Honorable

Kimberly J. Mueller, granted Petitioner's motion for acceptance of the amended traverse.  *See*

---

[1] "Controlling offense for which [Petitioner] is committed is set forth in Case Number SC043377.  Charging Count One, Violation PC 187, Murder in the Second Degree, with a 12022.5(a) PC Use of a Firearm.  [Petitioner] received a term of 15 years plus 3 totaling 18 years to life."  Resp't's Answer Ex. A, at 30, ECF No. 7, *but see* Pet'r's Pet. 1, ECF No. 1 (noting Petitioner stated his "length of sentence" is "15 to life").

[2] The Case Management/Electronic Case Files (CM/ECF) docketing and file system is implemented, which allows the parties to electronically file pleadings and documents.  For pleadings or documents submitted in paper format, the filing is scanned and stored electronically into the CM/ECF system.  Each page of the electronic filing is numbered chronologically, whether or not the party numbered it.  If the filing is lengthy, the document is divided into parts. Here, when a page number for a filed pleading or document is cited, the CM/ECF page number is used when available, which may not coincide with the page number that the parties used.

1    Order 1, Jan. 28, 2010, ECF No. 12.

2                                III.  CONSENT

3          On January 14, 2009, Petitioner consented, pursuant to 18 U.S.C. § 636(c)(1), to have a

4    Magistrate Judge conduct all further proceedings, including the entry of final judgment.  *See*

5    Pet'r's Consent, ECF No. 3.  Respondent, however, never responded to the "Consent Deadline

6    set for 7/22/2009" issued by the previously assigned Magistrate Judge.  *See* Order, Jan. 7, 2009,

7    ECF No. 4.  This case is submitted for decision but is currently unassigned to a United States

8    District Judge.  Since Respondent did not indicate his consent to jurisdiction by a United States

9    Magistrate Judge, the Clerk of the Court shall assign this case to a United States District Judge in

10   accordance with the Court's general assignment plan.

11                            IV.  FACTUAL BACKGROUND

12        A.  Commitment Offense[3]

13                 On July 12, 1990, [P]etitioner fatally shot David Velasquez in the
14                 back.  Velasquez, sixteen years old[,] died in the hospital due to a
                   pulmonary hemorrhage.

15                 Petitioner admitted to being a member of the Manila Boys, a
16                 Filipino gang who had a rivalry with the SIG[] gang[,] another
                   Filipino gang.

17                 Petitioner related to the Detective that he was driving home from a
18                 prayer meeting, and someone informed him that there were SIG[]
                   gang members in a pickup truck.  Petitioner was accompanied by a
19                 John Bunnot among other passengers.  Petitioner shot through the
                   driver side door with a pistol hoping to scare the "gang
20                 members[.]"[]  Instead, David Velasquez was mortally wounded.

21                 Petitioner was tried as an adult and sentenced to the above-
                   mentioned term on April 11, 1991, after pleading guilty on
22                 November 9, 1990.

23   _____

24        [3] These facts are from the Superior Court's opinion issued on May 20, 2008.  *See* Resp't's
     Answer Ex. B.  Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, a
25   determination of fact by the state court is presumed to be correct unless Petitioner rebuts that
     presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see Moses v. Payne,*
26   555 F.3d 742, 746 n.1 (9th Cir. 2009); *Davis v. Woodford,* 384 F.3d 628, 638 (9th Cir. 2004).

                                            3

B.  Petitioner's Background

    1.  Social History

Petitioner was seventeen years old and had no record when he committed the commitment offense.  Resp't's Answer Ex. A, at 49.  Petitioner "had a couple drinks one time" at a party, but otherwise had "no drug or alcohol use to speak of."  *Id.* at 52-53.  Petitioner felt he had no friends, and when the SIG gang tried to recruit him, he refused, so "that meant the Manila Boys thought [he] was their friend."  *Id.* at 52.

Petitioner was born and raised in the Philippines.  *Id.* at 49.  "Traumas in childhood include his mother dying in a car accident and him witnessing the death when he was 13 or 14."  *Id.* at 145.  Petitioner, along with his father, two brothers, and one sister, moved to Delano, California, when he was sixteen years old.  *Id.* at 49-50.  His grandparents raised him, and his father went to work in Alaska.  *Id.* at 51.  At the time of the hearing, one brother was a welder in Delano, and the other brother worked in Alaska "for six to nine months and comes back to Delano."  *Id.* at 54.  Petitioner's sister was a nurse and also lived in Delano.  *Id.*  Petitioner's father remarried, and Petitioner also had two half siblings, twins, with whom he said he is close.  *Id.* at 56.  The twins were nine years old at the time of the hearing.  *Id.*  Petitioner still received visits from friends and family.  *Id.* at 54-55.  "All of his family are law abiding, productive people in the community."  *Id.* at 119.

    2.  Education, Self-Help Programming, and Vocational Training

Petitioner completed eleven years of school when he committed the commitment offense.  *Id.* at 145.  Petitioner "received his high school diploma in Youth Authority [in 1993] and he has 44 units of college programming."  *Id.*; *see id.* at 62, 125.  Petitioner was "around 20 units short of an AA."  *Id.* at 125.  Petitioner received an award for academic excellence, dated July 17, 2006.  *Id.* at 65.  Petitioner also received a certificate from the University of Pacific where he attended a few courses, including American Democracy and Introduction to Social Psychology.  *Id.* at 66-67.  At the time of the hearing, Petitioner was taking college courses out of Coastline

4

Community College.  *Id.* at 70.

Petitioner performed well in prison.  *See, e.g., id.* at 62-66, 124-26.  Petitioner completed numerous self-help programs, including Alcoholics Anonymous (AA) and Narcotics Anonymous (NA);[4] Men's Violence Prevention; Relationship Awareness; Parenting Classes;[5] a ninety day bible study course called Men of Purpose; a faith base group; Victim Awareness in 1995; eleven programs in Set Free Prison Ministries, with a grade of more than ninety percent, on April 6, 2005; Man Alive on May 31, 2005; Phases in March 2006; a Stress Management Program on June 22, 2006; and Forty Days Purpose in September 2006.  *See, e.g., id.* at 63-66, 68-69, 117.  Petitioner completed seventeen FEMA programs.  *Id.* at 70.

Petitioner also received excellent work reports.  *Id.* at 64.  Petitioner received a Vocational Welding Certificate.  *Id.* at 60.  Petitioner "ha[d] Building Maintenance too," and was "in a vocation class" for Office Services and Related Training.  *Id.*  The Board acknowledged that "welding is one of the few vocations that the prison system ha[s] . . . that you can really go out and get a job at."  *Id.* at 132.  Ultimately, Petitioner wanted to pursue a degree in social science and become a counselor for kids through a "Christian based counseling course."  *Id.* at 93.

### 3.  Prior Criminal History

As stated earlier, Petitioner was "17 at the time of this commitment offense [and he] ha[d] no other record."  *Id.* at 48.

### 4.  Prison Disciplinary History

A 115 violation indicates a serious rules violation.  Cal. Code Regs. tit. 15, § 3312(a)(3)

---

[4] *See infra* Part IV.B.5.

[5] At the time of the hearing, Petitioner had never been married and had no children. Resp't's Answer Ex. A, at 146.  When the Board asked how Petitioner would utilize the parenting classes, Petitioner replied he would "eventually . . . be a father one day," and wanted to be prepared.  *Id.* at 63-64.  The Board commented, "I wish more people would do that.  Parenting is a hard job."  *Id.* at 64.

("When misconduct is believed to be a violation of law or is *not minor* in nature, it shall be reported on a CDC Form 115 (Rev. 7/88), Rules Violation Report." (emphasis added)). Petitioner has no 115 violations.  Resp't's Answer Ex. A, at 59.

Additionally, a 128 violation indicates minor misconduct.  CAL. CODE REGS. tit. 15, § 3312(a)(2) ("When similar *minor misconduct* recurs after verbal counseling or if documentation of *minor misconduct* is needed, a description of the misconduct and counseling provided shall be documented on a CDC Form 128-A, Custodial Counseling Chrono." (emphasis added)). Petitioner received two 128 violations.  Resp't's Answer Ex. A, at 59.  "One was on November 29, 1999[,] for covering [his] windows[,] and the other one was November 8[], 1999[,] for Delaying Count."  *Id.*  When rendering its decision, the Board commented that Petitioner's "institutional behavior is exemplary.  That's a good thing."  *Id.* at 124.

5.  March 21, 2005, Psychological Report

At the hearing, the Board also reviewed Petitioner's most recent psychological report, dated March 21, 2005.  *Id.* at 71.  The Board addressed the discrepancy between Petitioner's psychological report alleging Petitioner abused alcohol, Petitioner's denial of it, and his participation in AA and NA.  *Compare id.* at 73, 146-47 (psychological report alleging Petitioner "began drinking at the age of 16," was affected by "his substance abuse at the time," and had "[a]lcohol [a]buse, by history"), *with id.* at 53, 73 (Petitioner stated he had no drug or alcohol use and was sober during the commitment offense), *and id.* at 63, 67, 145 (Petitioner participated in NA and AA).  The two previous Boards also raised concerns over this discrepancy, *id.* at 75, and Petitioner's attorney explained that parts of the psychological report appeared "cut and paste." *Id.* at 77, *see also id.* at 117.  Petitioner reiterated he does not have issues with alcohol, and "all lifers are required to take the self-help programs even if you don't have an alcohol or drug problem."  *Id.* at 74.  Petitioner also stated he learned that "the most single important [thing] about AA is don't drink.  There are other ways that you can . . . solve the problem without resorting to alcohol or drugs."  *Id.* at 68.

1    The Board acknowledged that "[t]he other part of the psychological evaluation . . . [that]

2    is important for this hearing is the assessment of dangerousness." *Id.* at 73.  The report stated

3    Petitioner's "criminal history would not be an aggravating factor," and his "rating on the

4    historical factors would be in the low range in terms of risk of dangerousness in comparison to

5    inmates with similar crimes." *Id.*

6    C.  January 3, 2008, Board Decision

7    The Board denied Petitioner parole for a period of one year.  The Board explained, in

8    relevant part:

9    Petitioner, this Panel's reviewed all the information received and
     we've relied on the following circumstances in concluding you are
10   not yet suitable for parole and would pose an unreasonable risk of
     danger to society or a threat to public safety if released from
11   prison.

12   You presented very well today and we have many, many issues to
     commend you on.  First of all, your disciplinary behavior is
13   excellent.  You have no 115s and you've only had a couple 128s
     and I will get into that.

14
     We're giving you a one year denial.  You had a two year denial last
15   time.  A one year this time and we're going to give you some
     suggestions to kind of help keep you going in the same direction
16   you're going in. . . .

17   . . . .

18   . . . First of all we do talk about the commitment offense.  I took
     the statement of facts from the Board Report dated April 12th,
19   2007, page 1.

20   Where we get hung up on with you[,] [Petitioner], is that the
     statement of facts doesn't match with what you say or match with a
21   variety of things that you have said.  But Commissioner Welch has
     some really good ideas for you in that arena so when we get to him
22   momentarily I'll have him elaborate on that for you, all right?

23   . . . .

24   . . . But, you know, that this statement of facts indicates that on
     July 12th, 1990[,] you were involved in a shooting.  You indicate to
25   us that you had gone to church with a friend who was driving a
     church van, Mr. Bun[n]ot, and gone to a church meeting, and you
26   came out and there w[ere] four people waiting so there was six of

1   you in the van.

2   Somebody had a gun but you're not quite sure who, and that's one
    of the issues you need to work on.  But somehow you ended up
3   with the gun and shooting a young man . . . .  You thought you were
    shooting in retaliation to being harassed and victimized by the SIG
4   gang members but in fact you shot at and through a team of
    baseball players and . . . [by] the grace of God only one person died
5   because a lot more could have.

6   The offense was carried out in a manner which demonstrates
    disregard for human suffering.  We're having a great deal of
7   trouble here with you[,] [Petitioner], when it comes to your
    description of the commitment offense and why a young man like
8   you, going to church or coming back from church[,] would even
    align yourself with those kinds of influences.

9
    I think we have some understanding of that if you were harassed
10  and . . . I would like to believe you were an innocent among those
    less innocent.  I'm just not sure at this point. . . .
11
    The motive for this crime as best as we can figure out through you
12  and through what we read was that it was a retaliation of sorts
    because you had gotten tired of being intimidated.  And you have
13  absolutely no prior record.

14  . . . .

15  Your institutional behavior was exemplary.  That's a good thing.
    You have a classification score of 19.  You have received
16  absolutely no 115s.  You have received two 128As, both of them
    back in 1999.  That must not have been one of your better years.

17
    . . . .
18
    You have received three different types of certificates for three
19  different types of welding.  And also with regards to Vocation
    Building and Maintenance and you are now currently in your
20  Office Services Program.  You have a 12.9 TABE score.  You
    received your high school diploma in the [Y]outh [A]uthority in
21  '93 and you're around 20 units short of an AA.  So obviously in
    those two arenas you have been very successful.
22
    You have been extremely successful in the category of self-help . .
23  . . You've participated in the Men's Violence Prevention Program,
    Relationship Awareness, 40 Days of Purpose.  You've participated
24  in 11 different programs of the Set Free Prison Ministries, Stress
    Management Class, Phases and you also completed a 90 day bible
25  study class called Men of Purpose and you've taken around 17, I
    think there's a 28 total or something like that, of the FEMA
26  Program classes.  So you need to continue with your self-help. . . .

8

. . . .

. . . As you know, we had some difficulties with the psychiatric evaluation.  Not that it wasn't favorable, but it carried a mixed message.

For the record I would indicate that the Panel in 2005 were concerned about the fact that it indicates that you had apparently quite an alcohol problem.  We can find no record of that anywhere nor could that Panel.  And that Panel in fact requested further follow up because it appeared the information . . . was not accurate.

. . . .

. . . The Panel that you last saw, that postponed you for the same reason, felt there was a mix up as well.  Unfortunately we only received a letter from Dr. Tehrani indicating it was an okay psych. I don't think Dr. Tehrani understood that there was confusion between the psychs.  I think she must have missed that somewhere. Anyway, we have requested a new psychological evaluation to be completed on you prior to your new hearing.

. . . .

. . . [W]e also put down, and I will state on the record, we don't feel you have an alcohol or drug abuse problem. . . . I would like to see you stay in AA if you find benefit from that.

. . . .

. . . Parole plans, got to do a little bit of work on those.  You know you need a letter form [sic] your aunt and your uncle. . . . So before your next hearing, make sure that they write you a letter indicating that you have a place to stay with them. . . . As well, get updated letters . . . including the job offers and specifics.  It would also help you if you, it's not required, but I'll tell you frankly, it helps a lot if you have a job lined up when you leave here.

. . . .

. . . I mentioned to you the notices that were sent out, the 3042 notices and the District Attorney's office, as well as the police department were both in opposition to your parole at the time.

*Id.* at 121-29.

D.  State Court Decision

On October 29, 2007, the Superior Court denied Petitioner's habeas petition, stating, in

9

1  relevant part:

2     [The Board] used the following criteria to deny parole: 1.  The
   commitment offense[;] 2.  Inconsistencies in his story about the
3  commitment offense preventing him from gaining realistic insight
   into his crime; 3.  A confusing psychological report; and 4.  [N]o
4  secured employment either here in the United States or the
   Philippines.
5
      There is some evidence to support the denial of parole because lack
6  of insight into the commitment offense coupled with other factors
   the Board used demonstrated in its view[] that [P]etitioner remains
7  a threat to public safety.  (*In re Dannenberg* [](2005) 34 Cal.4th
   1061, 1079, 1080.)  The one year denial permits [P]etitioner to
8  work on the things he needs to do to ensure that he can present
   more evidence of his suitability at the next hearing.
9
      This court finds that [P]etitioner received the benefit of his bargain
10 for pleading guilty to second degree murder and the firearm
   enhancements.  The remaining counts were dismissed, and he
11 received advice of parole consequences.  This means he would
   have parole suitability hearings.  This does not mean that
12 [P]etitioner serve eighteen years of his sentence.  The sentence is
   eighteen years to life.  The hearing transcript indicates that
13 [P]etitioner received a prior hearing in 2006, and [was] deemed
   unsuitable for two years.  The strides he made cut that unsuitability
14 period down to one year.  This court finds that there is sufficient
   evidence to determine [P]etitioner unsuitable for parole.  (*In re
15 Ramirez* (2001) 94 Cal.App.4th 549, 563).  Under the *Dannenberg*
   standard, he remains a threat to public safety.  (*In re Dannenberg*
16 (2005) 34 Cal.4th 1061, 1079, 1080.)

17 Resp't's Answer Ex. B, at 4-5.

18        V.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

19    An application for writ of habeas corpus by a person in custody under judgment of a state

20 court can be granted only for violations of the Constitution or laws of the United States.  28

21 U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

22 *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

23 This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to,

24 the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521

25 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359, 362 (9th Cir. 1999).  Under

26 AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

In applying AEDPA's standards, the federal court must "identify the state court decision that is appropriate for our review." *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005). "The relevant state court determination for purposes of AEDPA review is the last reasoned state court decision." *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) (citations omitted). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). To the extent no such reasoned opinion exists, courts must conduct an independent review of the record to determine whether the state court clearly erred in its application of controlling federal law, and whether the state court's decision was objectively unreasonable. *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable--a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). "When it is clear, however, that the state court has not decided an issue, we review that question *de novo*." *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (citing *Rompilla v. Beard*, 545 U.S. 374, 377 (2005)).

## VI.  REQUESTS FOR REVIEW

The petition for writ of habeas corpus sets forth five requests.  Specifically, Petitioner requests:  (1) an order to show cause; (2) appointment of counsel; (3) discovery; (4) an

1   evidentiary hearing; and (5) declaratory and injunctive relief.  Pet'r's Pet. 29.

2       A.  First Request:  Order To Show Cause

3       First, Petitioner requests "an Order to Show Cause . . . on an expedited basis under CRC

4   4.551 et seq."  *Id.*  As stated earlier, Respondent filed an answer to the petition on August 18,

5   2009, to which Petitioner filed his original traverse on September 3, 2009.  Petitioner's request

6   for an order to show cause is denied as moot.

7       B.  Second Request:  Appoint Counsel

8       Second, Petitioner requests appointment of counsel in further litigation of this action.  *Id.*

9   The Sixth Amendment right to counsel does not apply in habeas corpus actions.  *See Knaubert v.*

10  *Goldsmith*, 791 F.2d 722, 728 (9th Cir. 1986).  A district court, however, may appoint counsel to

11  represent a habeas petitioner whenever "the court determines that the interests of justice so

12  require," and such person is financially unable to obtain representation.  18 U.S.C. §

13  3006A(a)(2)(B).  The decision to appoint counsel is within the district court's discretion.  *See*

14  *Chaney v. Lewis*, 801 F.2d 1191, 1196 (9th Cir. 1986).  Courts have made appointment of

15  counsel the exception rather than the rule by limiting it to:  (1) capital cases; (2) cases that turn

16  on substantial and complex procedural, legal, or mixed legal and factual questions; (3) cases

17  involving uneducated or mentally or physically impaired petitioners; (4) cases likely to require

18  the assistance of experts either in framing or in trying the claims; (5) cases in which the petitioner

19  is in no position to investigate crucial facts; and (6) factually complex cases.  *See generally* 1 J.

20  Liebman & R. Hertz, Federal Habeas Corpus Practice and Procedure § 12.3b, at 383-86

21  (2d ed. 1994).  Appointment is mandatory only when the circumstances of a particular case

22  indicate that appointed counsel is necessary to prevent due process violations.  *See Chaney*, 801

23  F.2d at 1196; *Eskridge v. Rhay*, 345 F.2d 778, 782 (9th Cir. 1965).

24       Appointment of counsel is not warranted in this case.  Petitioner's claims are typical

25  claims arising in a habeas petition and are not especially complex.  This is not an exceptional

26  case warranting representation on federal habeas review.  Petitioner's request for appointment of

1   counsel is denied.

2       C.  Third Request:  Discovery

3       Third, Petitioner requests discovery.  Pet'r's Pet. 29.  "The writ of habeas corpus is not a

4   proceeding in the original criminal prosecution but an independent civil suit."  *Riddle v. Dyche*,

5   262 U.S. 333, 335-36 (1923); *see, e.g.*, *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 14 (1992)

6   (O'Connor, J., dissenting).  However, modern habeas corpus procedure has the same function as

7   an ordinary appeal.  *O'Neal v. McAnnich*, 513 U.S. 432, 442 (1995) (recognizing federal court's

8   function in habeas corpus proceedings is to "review errors in state criminal trials" (emphasis

9   omitted)).  A habeas proceeding does not proceed to "trial," and unlike other civil litigation,

10  parties in a habeas proceeding are not entitled to discovery as a matter of course.  *Bracy v.*

11  *Gramley*, 520 U.S. 899, 904 (1997); *Harris v. Nelson*, 394 U.S. 286, 295 (1969).  Although

12  discovery is available pursuant to Rule 6 of the Federal Rules Governing Section 2254 Cases, it

13  is only granted at the court's discretion, and upon a showing of good cause.  *Bracy*, 520 U.S. at

14  904; *McDaniel v. U.S. District Court* (*Jones*), 127 F.3d 886, 888 (9th Cir. 1997); *Jones v. Wood*,

15  114 F.3d 1002, 1009 (9th Cir. 1997); *see also* Rule 6(a), Federal Rules Governing Section 2254

16  Cases.

17      Good cause is shown "where specific allegations before the court show reason to believe

18  that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . .

19  entitled to relief."  *Bracy*, 520 U.S. at 908-09 (quoting *Harris v. Nelson*, 394 U.S. at 300); *see*

20  *also Pham v. Terhune*, 400 F.3d 740, 743 (9th Cir. 2004).  A request for discovery "must also

21  include any proposed interrogatories and requests for admission, and must specify any requested

22  documents."  Rule 6(b), Federal Rules Governing Section 2254 Cases.  Federal courts have "the

23  power to 'fashion appropriate modes of procedure,' including discovery, to dispose of habeas

24  petitions 'as law and justice require[.]'"  *Bracy*, 520 U.S. at 904 (citations omitted) (quoting

25  *Harris*, 394 U.S. at 299-300); *see also Bittaker*, 331 F.3d at 728.

26      Here, Petitioner does not demonstrate good cause as to why his request for discovery

should be granted.  Petitioner does not state why discovery is necessary, or why discovery is

relevant to a determination of the petition's merits.  Petitioner also does not include any proposed

interrogatories or requests for admission, and fails to specify any requested documents, as

required under Rule 6(b).  *See* Rule 6(b), Federal Rules Governing Section 2254 Cases.

Petitioner has failed to establish good cause, and Petitioner's request for discovery is denied.

D.  Fourth Request:  Evidentiary Hearing

Fourth, Petitioner requests an evidentiary hearing.  Pet'r's Pet. 29.  Under 28 U.S.C. §

2254(e)(2), a district court presented with a request for an evidentiary hearing must first

determine whether a factual basis exists in the record to support a petitioner's claims and, if not,

whether an evidentiary hearing "might be appropriate."  *Baja v. Ducharme*, 187 F.3d 1075, 1078

(9th Cir. 1999); *see also Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005); *Insyxiengmay v.*

*Morgan*, 403 F.3d 657, 669-70 (9th Cir. 2005).  "[W]here the petitioner establishes a colorable

claim for relief and has never been afforded a state or federal hearing on this claim, we must

remand to the district court for an evidentiary hearing."  *Earp*, 431 F.3d at 1167 (citing

*Insyxiengmay*, 403 F.3d at 670; *Stankewitz v. Woodford*, 365 F.3d 706, 708 (9th Cir. 2004);

*Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir. 2001)).  In other words, a hearing is required if:

"(1) [the petitioner] has alleged facts that, if proven, would entitle him to habeas relief, and (2) he

did not receive a full and fair opportunity to develop those facts[.]"  *Williams v. Woodford*, 384

F.3d 567, 586 (9th Cir. 2004).

Here, Petitioner's request does not establish that these requirements are satisfied such that

an evidentiary hearing would be appropriate.  As explained later, Petitioner does not allege facts

that establish a colorable claim for relief because the Board's parole denial is supported by "some

evidence" demonstrating future dangerousness, and the Superior Court's decision is reasonable.

*See infra* Part VII.  Petitioner's request for an evidentiary hearing is denied.

E.  Fifth Request:  Declaratory and Injunctive Relief

Fifth, Petitioner requests an:  (1) "Order for Declatory [sic] Relief;" (2) "an Order for

14

1    Injunctive Relief;" and (3) a "Declar[ation of] the rights of the parties."  Pet'r's Pet. 29.  Since

2    habeas relief should not be granted, it is recommended that declaratory and injunctive relief be

3    denied.  *See infra* Part VII.

4          This matter is now ready for decision.  For the following reasons, it is recommended that

5    habeas relief be denied.

6                              VII.  CLAIMS FOR REVIEW

7          The petition for writ of habeas corpus sets forth two grounds for relief, both due process

8    claims.  First, Petitioner argues "there is no evidence with an 'indicia of reliability' under the

9    'some evidence' test[] that Petitioner is a current or unreasonable risk or danger to society."

10   Pet'r's Pet. 4.  Second, Petitioner asserts his plea agreement was violated when the Board denied

11   parole.  *Id.*

12         A.  Legal Standard for Parole Denial

13         The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives

14   a person of life, liberty, or property without due process of law.  A person alleging a due process

15   violation must first demonstrate that he or she was deprived of a protected liberty or property

16   interest, and then show that the procedures attendant upon the deprivation were not

17   constitutionally sufficient.  *Ky. Dep't. of Corr. v. Thompson*, 490 U.S. 454, 459-60 (1989);

18   *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).

19              1.  Liberty Interest in Parole

20         A protected liberty interest may arise from either the Due Process Clause itself or from

21   state laws.  *Bd. of Pardons v. Allen*, 482 U.S. 369, 373 (1987).  The United States Constitution

22   does not, in and of itself, create for prisoners a protected liberty interest in the receipt of a parole

23   date.  *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981).  The full panoply of rights afforded a

24   defendant in a criminal proceeding is not constitutionally mandated in the context of a parole

25   proceeding.  *See Pedro v. Or. Parole Bd.*, 825 F.2d 1396, 1398-99 (9th Cir. 1987).  The Supreme

26   Court has held that a parole board's procedures are constitutionally adequate if the inmate is

                                           15

given an opportunity to be heard and a decision informing him of the reasons he did not qualify for parole. *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 16 (1979). If a state's statutory parole scheme uses mandatory language, however, it "'creates a presumption that parole release will be granted' when or unless certain designated findings are made," thereby giving rise to a constitutional liberty interest. *McQuillion*, 306 F.3d at 901 (quoting *Greenholtz*, 442 U.S. at 12).

Section 3041 of the California Penal Code sets forth the state's legislative standards for determining parole for life-sentenced prisoners. Subsection (a) provides that "[o]ne year prior to the inmate's minimum eligible parole release date a panel . . . shall again meet with the inmate and shall normally set a parole release date . . . ." Subsection (b) provides an exception to the regular and early setting of a life-sentenced individual's term, if the Board determines "that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration . . . ." Based on this statute, California state prisoners who have been sentenced to prison with the possibility of parole have a clearly established, constitutionally protected liberty interest in receipt of a parole release date. *Allen*, 482 U.S. at 377-78 (quoting *Greenholtz*, 442 U.S. at 12); *Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006)); *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir. 2003); *McQuillion*, 306 F.3d at 903.

2. Scope of Due Process Protection

Additionally, as a matter of California state law, denial of parole to state inmates must be supported by at least "some evidence" demonstrating future dangerousness. *Hayward v. Marshall*, 603 F.3d 546, 562-63 (9th Cir. 2010) (en banc) (citing *In re Lawrence*, 44 Cal. 4th 1181, 82 Cal. Rptr. 3d 169, 190 P.3d 535 (2008); *In re Shaputis*, 44 Cal. 4th 1241, 82 Cal. Rptr. 3d 213, 190 P.3d 573 (2008); *In re Rosenkrantz*, 29 Cal. 4th 616, 128 Cal. Rptr. 2d 104, 59 P.3d 174 (2002)). California's "some evidence" requirement is a component of the liberty interest

created by the state's parole system. *Cooke v. Solis*, 606 F.3d 1206, 1213 (9th Cir. 2010).  The federal Due Process Clause requires, in turn, that California comply with its own "some evidence" requirement. *Pearson v. Muntz*, 606 F.3d 606, 609 (9th Cir. 2010) (per curiam).  A reviewing court must "decide whether the California judicial decision approving the . . . decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" *Hayward*, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(2)).

The analysis of whether some evidence supports the denial of parole to a California state inmate is framed by the state's statutes and regulations governing parole suitability determinations. *See Irons*, 505 F.3d at 851.  A reviewing court "must look to California law to determine the findings that are necessary to deem [a petitioner] unsuitable for parole, and then must review the record to determine whether the state court decision holding that these findings were supported by 'some evidence' [] constituted an unreasonable application of the 'some evidence' principle." *Id*.

### 3.  California's Parole Scheme

Title 15, section 2402 of the California Code of Regulations sets forth various factors to be considered by the Board in its parole suitability findings for murderers.  "All relevant, reliable information available to the [Board] shall be considered in determining suitability for parole." CAL. CODE REGS. tit. 15, § 2402(b).  This includes:

> [T]he circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.

*Id*.  The regulation also lists specific circumstances which tend to show suitability or unsuitability for parole. *Id*. § 2402(c)-(d).

Under section 2402(c)(1), factors relating to a commitment offense tend to show unsuitability for parole where (A) multiple victims were attacked, injured or killed; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled or mutilated; (D) the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering; or (E) the motive for the crime is inexplicable or very trivial in relation to the offense. *Id.* § 2402(c)(1)(A)-(E).

Other circumstances tending to indicate unsuitability include:

> (2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.
>
> (3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.
>
> (4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.
>
> (5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.
>
> (6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

*Id.* § 2402(c)(2)-(6).

Section 2402(d) sets forth circumstances tending to show suitability, which include:

> (1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.
>
> (2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.
>
> (3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or the prisoner has given indications that he understands the nature and magnitude of the offense.

(4) Motivation for Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress had built over a long period of time.

(5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

*Id.* § 2402(d)(1)-(9).

The overriding concern is public safety and the focus is on the inmate's *current* dangerousness.  *In re Lawrence*, 44 Cal. 4th at 1205, 82 Cal. Rptr. 3d 169, 190 P.3d 535.  The proper articulation of the standard of review is not whether some evidence supports the stated reasons for denying parole, but whether some evidence indicates that the inmate's release would unreasonably endanger public safety.  *In re Shaputis*, 44 Cal. 4th at 1254, 82 Cal. Rptr. 3d 213, 190 P.3d 573.  There must be a rational nexus between the facts relied upon and the ultimate conclusion that the prisoner continues to be a threat to public safety.  *In re Lawrence*, 44 Cal. 4th at 1227, 82 Cal. Rptr. 3d 169, 190 P.3d 535.

B.  Analysis of Parole Denial

1.  Ground One:  Due Process and Some Evidence

Here, the state court decision appropriate for review is the Superior Court's decision because it is the "last reasoned state court decision."  *Delgadillo*, 527 F.3d at 925 (citations omitted).  Under AEDPA's standards, the Superior Court properly held that "[t]here is some evidence" to show "[P]etitioner remains a threat to public safety."  *See* Resp't's Answer Ex. B, at

5.  The Superior Court considered Petitioner's (1) commitment offense; (2) lack of insight; (3) March 21, 2005, psychological report; and (4) no firm employment plans upon his release and/or deportation.  *Id.*

a.  Commitment Offense

First, the Superior Court reasonably held that the Board properly considered Petitioner's commitment offense, among other factors, when denying parole.  *Id.*  The Board read into the record the summary of Petitioner's commitment offense, "as found on the first page of the April 12th, 2007 Board Report."  Resp't's Answer Ex. A, at 37-38.  The Board then asked Petitioner for his version of what happened:

> PETITIONER:  I was just coming back from a prayer meeting at the time . . . .
>
> . . . .
>
> . . . I remember I was asleep inside the vehicle when I was suddenly awakened because we had (indiscernible) company inside and they started screaming that someone's going to kill them and I just woke up in a panic and I wish I would have . . . not done it.  I mean I was just so scared and, I mean, that I did this and especially taking another person['']s  –
>
> ATTORNEY NEWMAN:  It's okay.  Take your time.
>
> . . . .
>
> PRESIDING COMMISSIONER SHELTON:  There's some Kleenex in front of you, sir.
>
> PETITIONER:  Yes, ma'am.  Thank you.  I was just frightened.  I didn't know how to handle it and I knew that I didn't have the gun with me.  Someone handed me a gun and out of stupidity I grab it and fired one shot just to scare them off.  That was my intention but little did I know that I did point it at the vehicle park[ed] in front of the house that we were supposed to stop [at], and unfortunately, you know, a young kid got hit and died from my action and I'm truly sorry for that, you know.

*Id.* at 38-40.

When rendering its decision, the Board commented, "The offense was carried out in a manner which demonstrates disregard for human suffering."  *Id.* at 123.  The Board had "trouble"

20

with Petitioner's "description of the commitment offense" and why someone "going to church or coming back from church would even align [him]self with those kinds of influences." *Id.* The Board pointed out that "[t]he motive for this crime . . . was that it was a retaliation of sorts because [Petitioner] had gotten tired of being intimidated." *Id.* The Superior Court reasonably found that the Board weighed the nature and gravity of Petitioner's commitment offense when denying Petitioner parole. *See* Cal. Code Regs. tit. 15, § 2402(c)(1).

### b. Lack of Insight

Second, the Superior Court reasonably held that the Board appropriately found Petitioner needed additional insight into the commitment offense. Resp't's Answer Ex. B, at 5. When reviewing Petitioner's commitment offense, the Board commented, "Well, I'm still trying to sort this out here. Okay? So you're going to have to try to talk about this. . . . So who had the gun?" Resp't's Answer Ex. A, at 41-42. Petitioner responded:

> Who had the gun? It was one of them that had the gun in a fanny pack. I remember that. And it was -- if it's not John it was one of the guys that gave it to him and told him to, "Hey," you know, "take this."

*Id.* at 42. Petitioner answered it was the only gun in the car, and explained the gun was handed to him because "he was in the passenger [seat]. [Petitioner] was in the passenger [seat] and John was driving and when that moment came[,] when they started screaming[,] someone handed [Petitioner] the gun. It was inside a fanny pack." *Id.* Petitioner also answered that he was shot at the day before, when he was with a different person, and did not know who shot at him. *Id.* at 42-43. The Board noted, "[I]t would be really nice if you were contributing some information instead of us having to ask a lot of questions like this. . . . [W]e're both having a difficult time trying to sort out what was going on and why you would shoot a gun at a group of people you didn't know when you never shot a gun in your life before, according to you. It's not a natural reaction." *Id.* at 48.

When rendering its decision, the Board remarked that there are "some little nuances . . .

that you really need to be able to clear up and these are things that the decision review of the

Governor's office would have questions about[.]  [L]ike[,] was the gun in your waistband?  Was

it underneath the seat or did someone hand it to you?  Were there two guns in the car?  Did you

deliberately go out looking for the folks that you thought that had shot at you later?" *Id.* at 131.

The Board wanted "to believe [Petitioner] w[as] an innocent among those less innocent," but was

unsure. *Id.* at 124.  The Superior Court reasonably found that the Board properly determined

Petitioner needed additional insight into the commitment offenses when denying parole. *See*

CAL. CODE REGS. tit. 15, § 2402(b); *In re Shaputis*, 44 Cal. 4th at 1261, 82 Cal. Rptr. 3d 213,

190 P.3d 573 (holding "gravity of the offense and petitioner's lack of insight and failure to accept

responsibility" constituted some evidence "suggest[ing] petitioner remains a current danger to the

public"); *cf.* CAL. CODE REGS. tit. 15, § 2402(d)(3).

### c. March 21, 2005, Psychological Report

Third, the Superior Court reasonably considered Petitioner's March 21, 2005,

psychological report when assessing Petitioner's current dangerousness.  Resp't's Answer Ex. B,

at 5.  When rendering its decision, the Board noted that "we had some difficulties with the

psychiatric evaluation," and the previous Board "postponed [Petitioner] for the same reason."

Resp't's Answer Ex. A, at 126-27.  The Board stated, "Unfortunately[,] we only received a letter

from Dr. Tehrani indicating it was an okay psych.  I don't think Dr. Tehrani understood that there

was confusion between the psychs." *Id.* at 127.  The Superior Court reasonably found that the

Board properly considered Petitioner's 2005 psychological report when denying parole.  CAL.

CODE REGS. tit. 15, § 2281(b).

### d. No Firm Employment Plans

Fourth, the Superior Court reasonably found that the Board considered Petitioner's lack

of "firm employment plans upon his release and/or deportation . . . [when] deny[ing] parole."

Reps't's Answer Ex. B, at 5.  During the hearing, Petitioner failed to provide an updated letter

from his aunt and uncle, with whom he wanted to reside.  Resp't's Answer Ex. A, at 91.  Instead,

he had a letter date-stamped March 12, 2001.  *Id.* at 91-92.  Petitioner explained he asked them to write a letter, and "they *might* have sent it here, and, you know, the backlog--[.]"  *Id.* at 92 (emphasis added).  Petitioner stated that the letter probably "didn't get filed on time."  *Id.*

When rendering its decision, the Board explained Petitioner needed "to do a little bit of work" on his parole plans.  *Id.* at 128.  The Board recommended that Petitioner "get updated letters from the rest of [his] family so they have dates on them for next year[,] . . . [i]ncluding job offers and specifics."  *Id.*  The Board told Petitioner it would "help[] a lot if [he] ha[d] a job lined up" if he were paroled.  *Id.* at 128-29.  The Board properly determined Petitioner had no firm parole plans, and the Superior Court reasonably affirmed this.  *Cf.* CAL. CODE REGS. tit. 15, § 2402(d)(8).

In sum, the Superior Court reasonably concluded that "some evidence" indicates Petitioner's current dangerousness.  *See* Resp't's Answer Ex. B, at 4.  The Superior Court's considered Petitioner's (1) commitment offense; (2) lack of insight; (3) March 21, 2005, psychological report; and (4) lack of firm employment plans.  *See id.*  These factors demonstrate a nexus between the facts in the record regarding Petitioner's commitment offense and the ultimate conclusion that Petitioner still posed a risk of danger or threat to the public.  These factors also independently demonstrate some evidence in the record that Petitioner was not suitable for parole.  The Superior Court reasonably concluded that the Board's decision withstands the minimally stringent "some evidence" test and has not violated Petitioner's right to due process.

2.  Ground Two:  Breach of Plea Agreement

Second, Petitioner argues that his "plea agreement was violated when the . . . Board denied parole."  Pet'r's Pet. 4.  Petitioner admits that "[c]entral to this [plea] contract was the understanding that Petitioner would be released on parole *if he met the suitability criteria*, served sufficient time per the Board's matrix, and was actually granted parole by the Board."  *Id.* at 25 (emphasis added).  Petitioner asserts his "plea to murder cannot be interpreted as other than an

23

1   exchange for the guarantee of parole." *Id.* at 26.

2       "Plea agreements are contractual in nature and are measured by contract law standards."

3   *Brown v. Poole*, 337 F.3d 1155, 1159 (9th Cir. 2003) (quoting *United States v. De la Fuente*, 8

4   F.3d 1333, 1337 (9th Cir. 1993)).  Although a criminal defendant has a due process right to

5   enforce the terms of a plea agreement, *see Santobello v. New York*, 404 U.S. 257, 261-62 (1971),

6   there is no evidence that Petitioner's subjective expectations about how parole would be decided

7   were part of the plea agreement.  Petitioner has not pointed to any language in any plea

8   agreement showing that any specific term in his plea agreement has been breached.  Petitioner's

9   sentence upon his conviction based on his plea agreement was to an indeterminate term of

10  eighteen years to life in state prison.  He has received the parole consideration at hearings to

11  which he was entitled under that agreement and sentence.  The Superior Court's rejection of

12  Petitioner's claim was not contrary to, or an unreasonable application of, clearly established

13  federal law as determined by the United States Supreme Court.  Petitioner's claim that his plea

14  agreement was breached in violation of his right to due process fails.

15                                 VIII.  CONCLUSION

16      For the foregoing reasons, IT IS HEREBY ORDERED that:

17      1.  The Clerk of the Court shall ASSIGN this case to a United States District Judge in

18  accordance with the Court's general assignment plan;

19      2.  Petitioner's request for an order to show cause is DENIED as moot;

20      3.  Petitioner's request for appointment of counsel is DENIED;

21      4.  Petitioner's request for discovery is DENIED; and

22      5.  Petitioner's request for an evidentiary hearing is DENIED.

23      IT IS HEREBY RECOMMENDED that:

24      1.  Petitioner's application for writ of habeas corpus be DENIED; and

25      2.  Petitioner's claim for declaratory and injunctive relief be DENIED.

26      These findings and recommendations are submitted to the United States District Judge

                                      24

assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one

days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

shall be served and filed within seven days after service of the objections.  Failure to file

objections within the specified time may waive the right to appeal the District Court's order.

*Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156-57

(9th Cir. 1991).  In any objections he elects to file, Petitioner may address whether a certificate of

appealability should be issued in the event he elects to file an appeal from the judgment in this

case.  *See* Rule 11(a), Federal Rules Governing Section 2254 Cases (district court must issue or

deny certificate of appealability when it enters final order adverse to applicant).

DATED:          January 12, 2011.

TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE